UNITED STATES, Appellee,

v.

Antulio PARRILLA BONILLA,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Judith BERKAN, Defendant, Appellant.

UNITED STATES, Appellee,

v.

Salvador TIO, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

William Andres TREVATHAN,
Defendant, Appellant.

Nos. 79–1462, 79–1479, 79–1528
and 79–1533.

United States Court of Appeals,
First Circuit.

Argued Feb. 2, 1981.

Decided May 19, 1981.

Harry Anduze Montano, Santurce, P. R. and Michael Ratner, New York City, with whom Roberto Buso, Santurce, P. R., Alvaro R. Calderon, Hato Rey, P. R., Margaret Ratner, New York City, Jose Antonio Lugo, Hato Rey, P. R., and Doris Peterson, New York City, were on brief, for appellants.

David B. Smith, Atty., Dept. of Justice, Washington, D. C., with whom Raymond L. Acosta, U. S. Atty., San Juan, P. R., was on brief, for appellee.

Before CAMPBELL, BOWNES and BREYER, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

Each of the appellants was convicted at a separate non-jury trial held in the District Court for the District of Puerto Rico of entering upon a United States naval reservation in violation of 18 U.S.C. § 1382.[1] Of their numerous challenges to the convictions and ensuing sentences, the most substantial is their contention that in each case the government failed to prove all elements of the offense charged. We agree, and on this basis are constrained to reverse the convictions.

## I.

Appellants were among 21 persons arrested on May 19, 1979 at Bahia de la Chiva, also known as Blue Beach, located on the southeastern coast of the island of Vieques. The United States Navy owns approximately 76 percent of Vieques, a municipality of the Commonwealth of Puerto Rico, and periodically conducts military operations there, including exercises in weapons fire and amphibious landings. *See Romero Barcelo v. Brown,* 643 F.2d 835, 838–840 (1st Cir. 1981). On May 19, 1979, the Navy planned to use Bahia de la Chiva as part of an amphibious maneuvers exercise.

The district court took "judicial notice" that for over a year preceding appellants' arrests there had been widely publicized controversy regarding the Navy's presence on Vieques. At the trials of Tio and Treva-

---

1. The district judge found each defendant guilty at the conclusion of each trial. After the trials had ended, the court issued findings of fact relative to each case. *See* Fed.R.Crim.P. 23(c).

than, evidence was introduced indicating that demonstrations against the Navy had been conducted on Vieques, and on Bahia de la Chiva in particular, during the week prior to May 19, 1979.[2] One such incident occurred on May 16, 1979, when a group of fishermen attempted to disrupt an amphibious landing on Bahia de la Chiva.[3]

Nineteen of the 21 persons arrested on May 19, 1979[4] (including appellants) were charged in separate informations with violating section 1382 by "[going] upon Bahia de la Chiva Beach, also known as Blue Beach, Camp Garcia Annex, U.S. Naval Station, Roosevelt Roads, for a purpose prohibited by lawful regulation, in that [they] did enter without proper authorization from the Commanding Officer as required by Title 32, Code of Federal Regulations, Section 765.4 and NAVSTAINST 5510.9H of November 9, 1978." Although appellants stood trial separately, both the evidence presented against them and the district court's findings were largely the same, as follows.

Lieutenant Commander Samuel Meiss, attached to the Special Warfare Group at Roosevelt Roads Naval Station, Puerto Rico,[5] testified that about 7:00 a. m. on May 19, 1979 he received orders to deploy security forces to Camp Garcia, following reports that a number of privately owned ships had been sighted in the vicinity of Blue Beach. His forces, 30 uniformed Navy security personnel, were transported from Roosevelt Roads to Vieques by helicopter. Once there, they approached Blue Beach by land, in two separate groups. When Meiss first arrived at Blue Beach, between 10:00 a. m. and 12:00 noon,[6] he stationed himself and his men behind a line of trees. He observed about 200 people "milling about" on the beach and noticed that some tents had been pitched there. A large number of craft were drawn up on the beach. During the time he was present, Meiss saw at least three of the appellants at a point above the "brim line" or "high water mark" on the beach.[7] Soon after his arrival, the two groups of security personnel consolidated and moved out in plain view of the civilians; shortly after that, Admiral Knoizen, Commander of Naval Forces, Caribbean, ordered Meiss to detain the civilians. The detention process, which was marked by minor altercations, lasted about an hour, during which time many of the 200 persons retreated to boats and left the area.[8] Nineteen persons were forceably detained and taken aboard a Navy landing craft; appellants Parrilla and Trevathan walked aboard the landing craft voluntarily and were arrested along with the other detainees.

Alexander de la Zerda, a naval liaison officer on Vieques, testified that the usual procedure for entering Camp Garcia, to which Blue Beach is appended, is to proceed

---

**2.** There was no evidence that appellants had been participants in, or otherwise involved with, these demonstrations. At Tio's trial, there was evidence that Tio had never been detained or arrested for trespassing on Camp Garcia prior to May 19, 1979.

**3.** Evidence at the trials of Tio and Trevathan indicates that the attempt was unsuccessful and that no action was taken against the fishermen.

**4.** Two newsmen who were arrested were not charged.

**5.** The naval reservation on Vieques is part of the Roosevelt Roads Naval Station, the main part of which is located at Ceiba, Puerto Rico. The Navy witnesses at the trials generally used Roosevelt Roads to refer to the Ceiba portion of the base and Camp Garcia to refer to the Navy's land on Vieques.

**6.** At Tio's trial, de la Zerda placed the arrival of Navy security personnel between 12:00 noon and 12:30 p. m.

**7.** Meiss defined the "brim line" as a visible feature on most beaches caused by the erosion action of the daily high tides.

**8.** Meiss divided the forces into three groups; one group approached the civilians from the east, one was positioned to prevent "flanking" to the west, and the third was placed near the brush line to prevent civilians from coming further inland. There was initially resistance from the civilians, and a "scuffle" broke out with some sand and rock throwing. Meiss then ordered his men to "bisect" a few civilians at a time away from the main group, to facilitate arrests.

through a main gate, located about four miles from Blue Beach, and obtain a visitor's pass. He testified further that two "roving patrols" traverse Camp Garcia and the adjacent Navy lands on a regular basis, searching for unauthorized personnel. During the first week in May 1979, de la Zerda participated in the distribution of a document warning "fishermen and other interested persons" not to use certain of the waters surrounding Vieques during the week of May 14–20, 1979, because of potentially dangerous Navy activities. Copies of the notice were given to the Fishermen's Association on Vieques and were posted at the Vieques police station, post office, and at the front gate of Camp Garcia.

Tommy Thompson, security officer at the Roosevelt Roads Naval Station, testified concerning the procedure governing entrance to the naval reservation on Vieques, a procedure embodied in Naval Instruction 5510.9H, which was introduced into evidence. In brief, non-military personnel must obtain a pass to enter the naval base. Based on his search of the relevant records, Thompson testified that no passes were issued to appellants on May 19, 1979. According to Thompson, apprehended trespassers are usually brought to the security office and given a letter barring reentry on the naval facility; Thompson admitted that this procedure, and other of the "normal procedures" for dealing with apprehended

trespassers, were not followed in these cases.[9]

Joseph Loyacano, a member of the Navy's Civil Engineer Corps, testified primarily concerning a map and written description of Navy property on Vieques taken from court records of the 1942 condemnation proceedings pursuant to which the United States acquired private lands on Vieques for the establishment of fleet operating facilities.[10] With reference to these documents, Loyacano testified that Bahia de la Chiva was included within the Navy's property, and that the southern border of the Navy's land at this point was the "ordinary high tide line." In addition, the government introduced a certification from the Registry of Property, Humacao Section, Puerto Rico, showing that title to the parcel to which Loyacano referred is registered in the name of the United States.[11]

## II.

18 U.S.C. § 1382 provides, in relevant part:

"Whoever, within the jurisdiction of the United States, goes upon any military, naval, or Coast Guard reservation, post, fort, arsenal, yard, station, or installation, for any purpose prohibited by law or lawful regulation . . .

.    .    .    .    .

9. According to de la Zerda, testifying at Tio's trial, during the period of his tenure at Camp Garcia prior to May 19, 1979 (beginning July 1978), no persons had been prosecuted or charged for trespassing on the naval base.

10. At the trials of Parrilla and Trevathan, the government also introduced a "combat map" prepared by the U.S. Defense Mapping Agency, but little reference to it was made.

11. Trevathan, Berkan, and Parrilla rested at the close of the government's case. At Tio's trial, the defense put on several witnesses. Pedro Miranda Corrada, an architect presented as an expert on Puerto Rico's shore lines, testified that the brim line on Vieques beaches is constantly changing (usually over a span of 10 feet horizontally during the course of a year), and that during the period of the year's highest tide (October or November) the water on Blue Beach might occasionally reach the vegetation line. Radames Tirado, Mayor of Vieques, testi-

fied that the Navy's presence had an "adverse effect" on Vieques; that frequent demonstrations against the Navy had been held on Vieques prior to May 19, 1979; and that the Navy had previously taken no action against demonstrators. Wilfredo Toledo, a photographer, testified that he was sent to Blue Beach on May 19, 1979 to "cover an event" for a newspaper; he arrived by boat from Esperanza along with about 75 people; he witnessed Tio's detention, at which time Tio was in the water. Through testimony of Joe Barry Durham, Tio laid a foundation for the introduction of palm prints and photographs that had been taken of persons present on Blue Beach, May 19, 1979, subsequent to their arrests; Durham also testified that Tio was given a "barring letter" by a security officer at Roosevelt Roads. Victor Pons was sworn as a witness, but his testimony was rejected as irrelevant.

Shall be fined not more than $500 or imprisoned not more than six months, or both." [12]

The informations charge appellants with entering Camp Garcia Annex for the purpose of violating 32 C.F.R. § 765.4 and Naval Instruction 5510.9H, both "lawful regulations." *See* part I, *supra.* 32 C.F.R. § 765.4 provides that "access to any naval activity" is subject to the authorization and control of the officer in command and to "restrictions prescribed by law or cognizant authority." Naval Instruction 5510.9H, an internal, unpublished Navy document, requires, *inter alia*, that persons entering Camp Garcia obtain authorization and receive a pass. In essence, then, appellants are charged with entering a restricted naval reservation "for the purpose" of entering without authorization.

There is a threshold question whether these informations are sufficient to allege the elements of a section 1382 violation. Appellants and the government agree that one element of the offense is unauthorized entry on a restricted United States military reservation. Appellants contend, however, that the government must allege and in addition that the trespasser intended to commit a crime *other than* the entry itself, such as arson, larceny, or espionage. Alternatively, appellants argue that the government must allege and demonstrate the defendant's "specific intent" to violate the precise regulation restricting access to the military facility.

■ We conclude, in essential agreement with virtually every other court that has considered the issue, that the requisite prohibited "purpose" under section 1382 can consist of unauthorized entry itself, and that no "specific intent," in the strict sense, to violate the law or regulation prohibiting such entry need be shown. *United States v.*

*Mowat*, 582 F.2d 1194 (9th Cir.), *cert. denied*, 439 U.S. 967, 99 S.Ct. 458, 58 L.Ed.2d 426 (1978); *United States v. Floyd*, 477 F.2d 217 (10th Cir.), *cert. denied*, 414 U.S. 1044, 94 S.Ct. 550, 38 L.Ed.2d 336 (1973); *see also United States v. Holmes*, 414 F.Supp. 831 (D.Md.1976); *United States v. Bishop*, 261 F.Supp. 969 (N.D.Cal.1966); *cf. United States v. Patz*, 584 F.2d 927, 929 (9th Cir. 1978). Such an interpretation is suggested by the words of the statute, which prohibit entry for *any purpose* prohibited by a lawful regulation. This language does not indicate a requirement that the defendant harbor a "specific intent" to violate a particular regulation, only that he act with a "purpose" that is in contravention of the regulation's terms. Nor does the statute attempt to limit the class of regulations violation of which will serve as an element of the offense. Furthermore, as suggested in *United States v. Mowat, supra*, 582 F.2d at 1204, it is highly unlikely that Congress intended section 1382, a "petty offense" carrying relatively light maximum penalties, to apply only in cases where the government can show beyond a reasonable doubt that a defendant intended to commit a serious crime such as espionage or destruction of property when he entered the military reservation.

■ On the other hand, when a section 1382 prosecution proceeds on the basis that the defendant has entered a restricted military reservation "for the purpose of" unauthorized entry, we think it must be shown that the defendant had knowledge or notice that such entry *was*, in fact, prohibited.[13] *See United States v. Floyd, supra*, 477 F.2d at 225. *Cf. United States v. Patz, supra*, 584 F.2d at 929 ("The usual situation in which 18 U.S.C. § 1382 is applicable is that in which the entry is with knowledge that the facility has been closed to the public by

12. The second paragraph of section 1382 imposes the same penalty upon

"Whoever reenters or is found within any such reservation, post, fort, arsenal, yard, station, or installation, after having been removed therefrom or ordered not to reenter by any officer or person in command or charge thereof."

13. The government does not argue otherwise. The interpretation of section 1382 advanced by the government on appeal is that the statute prohibits entry upon a military reservation by those *with knowledge* that they are not permitted to do so.

properly promulgated regulations of the military commander."). Section 1382 is not a "general trespass statute," *id.*, and was not intended to impose criminal liability on "innocent trespassers." *Holdridge v. United States*, 282 F.2d 302, 309 (8th Cir. 1960). Congress might have made criminal any entry without permission upon a military base; this it did not do. Instead, it established as requisite to the criminality of *initial* trespasses that entry be made for a purpose prohibited by law or regulation. The word "purpose" imports at least some sort of culpable design or mental state. *See Holdridge, supra*, 282 F.2d at 309. When the proscribed "purpose" consists of no more than the entry itself, we think the clear implication is that, at a minimum, the defendant had notice of the prohibition of entry upon the military reservation, yet entered anyway.

██ Were we to hold otherwise, we would render the second paragraph of section 1382 largely surplusage. That paragraph prohibits *reentry* onto military property, regardless of "purpose," after the trespasser has been "removed therefrom or ordered not to reenter by any officer or person in command or charge thereof." *See* note 12, *supra.* As noted in *Holdridge, supra*, 282 F.2d at 308–09, "[t]his paragraph thus involves a *second* invasion of the premises and one where the accused, because of his prior physical removal or the formal order, is definitely aware that re-entry is prohibited." There would have been little reason, however, for Congress to include this paragraph directed at "second invasions" were trespassers rendered liable under the first paragraph of section 1382 for any unauthorized entry onto a restricted military base, without regard to their "awareness" that the entry was unlawful. Indeed, the interpretation we adopt here simply harmonizes the two paragraphs of

section 1382. Thus, persons may not enter military reservations that are closed to them, provided they have notice or knowledge that their entry is prohibited. When such advance notice or knowledge is demonstrated, persons may be criminally prosecuted under section 1382 for an initial trespass. When such notice or knowledge is not shown as regards the initial entry, removal or an order not to reenter establishes the requisite knowledge for purposes of subsequent entries.

### III.

██ We now turn to appellants' contention that the government's evidence was insufficient to prove that they entered Blue Beach with knowledge or notice that their entry was unlawful. The evidence in the individual trial records before us is indeed scant on this score. There was no evidence appellants had ever seen, or even knew of the existence of, Naval Instruction 5510.9H. This, by itself, was by no means fatal. It would have been enough to have shown that appellants reasonably understood that naval authorities had declared the base closed to all persons who lacked passes or other authorization. As we have pointed out, however, a trespasser on a military reservation who is without notice or knowledge that the reservation has been closed to the public, violates section 1382 only if he reenters after first being warned off. It follows that knowledge cannot be inferred from the mere fact that it was a military installation upon which entry was made. Something more must be shown. When appellants came on Blue Beach on May 19, 1979, they were not confronted by a fence or other visible boundary marking from which to infer the Navy's closing of the installation to outsiders.[14] Although uni-

---

14. According to de la Zerda, there is a fence running north to south on Vieques that marks the westernmost border of the Camp Garcia Annex, located, at the south coast of the island, some two to three miles west of Blue Beach. Meiss testified at Berkan's trial that there are

no fences visible from Blue Beach. The district court found in each case that "no fences appear on the beach areas" of Camp Garcia. At Parrilla's trial, the government "stipulated" that "there is no fence on the area known as Blue Beach."

formed Navy security personnel later appeared on the scene,[15] they began making arrests within a few minutes thereafter,[16] and there was no evidence that they warned appellants to leave the beach prior to making the arrests.[17]　Nor were there any signs posted to warn appellants that entry onto the beach was prohibited.[18]　In-

15.　The government points to "the presence of large numbers of uniformed naval security personnel on the beach" as evidence of notice to appellants "that their entry upon Blue Beach was unlawful."　It is clear from Meiss's testimony, however, that the persons on the beach were already present when the security personnel arrived.　Furthermore, when these security personnel first arrived, they were stationed behind the tree line, an exercise Meiss acknowledged constituted "hiding from the civilian group."　Apart from the incident recounted below, *see* note 17, *infra*, there was no communication between the security personnel and the civilians, even when the former stepped out into "plain view."

16.　The district court found in each case that "[the security forces'] acts of detaining individuals at the beach is further evidence that should have placed Defendant on notice that he was upon federal property."　We have difficulty understanding the relevance of the arrests to the question of notice, however, particularly in the case of Berkan who, according to Meiss, was one of the first arrested.　One is obviously not given sufficient notice of unlawful entry, for purposes of section 1382, if that notice comes only at the instant one is detained.　According to Meiss, when the security forces began detaining civilians, the civilian group became surrounded on three sides by security personnel, and was boxed in on the fourth side by water.　While many civilians were able to swim to boats and escape, we cannot say that adequate "notice" was given to those who were not.

17.　At Tio's trial, Meiss testified that in the "few minutes" between the time the Navy forces came into sight and the time the arrests commenced, he observed a "uniformed individual" leave Admiral Knoizen's side and "meet, come in close proximity with the civilians.　There appeared to be to me some kind of a discussion though it was very brief. . . .　The individual returned and consulted or I observed him talking with the Admiral."　At Parrilla's trial Meiss likewise testified that he observed "[an] officer depart from talking with Admiral Knoizen and proceed and have a brief conversation with several members, several people that were on the beach proper."　There is no evidence of the content of this "brief conversation," nor is there any indication whether appellants were among the "several people" within earshot of the unidentified officer.　Meiss testified at Tio's trial that the 200 civilians were "strung out over a distance of some 75 yards"; at Trevathan's trial they were "all strung out, up and down the beach, over a distance of some 200 to 250 yards"; at Parrilla's trial they were "strung out the entire length of what is known as Blue Beach" (estimated by Meiss, at Tio's trial, to be 1,400 yards long).　Thus, the testimony regarding the "brief discussion" by the single officer is not evidence that appellants were warned to leave the beach.　(At Berkan's trial Meiss testified "I did not give any orders to civilians to leave the premises.")

The government also points to an excerpt from a report written by de la Zerda, introduced only at Tio's trial, which reads:

"*19 May* . . .　At about noon, fifty protesters landed on Blue Beach; there were many more people in boats off-shore.　*After the protesters were told to leave the beach,* but refused, some were detained by Navy Security forces."

There is no indication, however, as to what this brief statement refers; it may well be that de la Zerda is referring to the same conversation mentioned by Meiss.　(We note also that the above excerpt contradicts Meiss's testimony at every trial that there were 200 people on the beach.)　More important, de la Zerda testified on behalf of the government at each of the four trials and never mentioned that any warning had been given the "protesters."　Had the government intended to introduce evidence of warnings through de la Zerda, it would have done well to pose questions to him in this regard at trial, rather than relying after the fact on a snippet of hearsay contained in one of appellant Tio's exhibits.

18.　At each trial appellants introduced photographs of the sign referred to in text, *infra*.　At Tio's trial, de la Zerda testified that this sign was the only sign at Blue Beach.　De la Zerda also testified, at the trials of Parrilla and Tio, that there was a sign at the main gate to Camp Garcia, four miles from Blue Beach, and a "no trespassing" sign on the northern part of the north/south fence, about six miles from the beach.　At Parrilla's trial, Loyacano said he did not believe there were any "restricted signs" at Blue Beach, although he was not sure.

Lt. Moye gave some rather confusing testimony about signs (at Parrilla's trial only).　Moye said initially there were "very many" restricted signs in the area of Blue Beach.　She then said there was one sign "down the beach on land" and "another one outside from land."　After being shown the photographs of the "you are now a guest" sign, introduced by Parrilla, she said she had seen the sign and it was still on the beach.　(On first viewing the photograph she had responded that she could not "see whether it is Blue Beach, Red Beach, Purple Beach, whatever.")　Asked if it was the

deed, the only sign on the beach read as follows:

## BLUE BEACH

YOU ARE NOW A GUEST ON THIS U.S. MILITARY RESERVATION. ENJOY YOURSELF AND CLEAN UP AFTER YOURSELVES.[19]

The district court did point to several factors aside from the happenings on the beach as being "circumstantial evidence" that appellants knew their entry onto Blue Beach was unlawful. First, the court found that notices warning of the Navy's amphibious maneuvers on May 19, 1979 had been posted and distributed on Vieques. This notice, however, simply "informs" fishermen of the Navy's activities, and warns that the activities "can be dangerous to personnel and fishing equipment."[20] Leaving aside the fact that the notice does not indicate that entry into the danger zones is unlawful, the notice is directed only toward entry into the *waters* off Vieques; it would not directly inform potential trespassers that entry upon the lands encompassed by Camp Garcia has been forbidden by law or regulation.[21]

In Berkan's case, the district court cited, as evidence of notice, the fact that Berkan had represented the Vieques Fishermen's Association in a civil action, *United States v. Zenon*, wherein the court had enjoined not only the Association but also its "officers, agents, servants, employees, *attorneys*, members, aiders, abettors, sympathizers, and any and all persons in active concert or participation with them" (emphasis added) from:

"(1) unlawfully entering, or remaining therein, the navigable waters of the restricted area established and published in 33 Code of Federal Regulations 207.-815(a)(3), specifically being a strip 1,500 yards wide on the South coast of the Island of Vieques, Puerto Rico, extending

"restricted sign" she had referred to, she answered she "was thinking of another one," a "red one," and "also thinking of another one that was out in the ocean." Asked again if the sign in the photograph was not the only one on Blue Beach, she responded "I feel there is another one there also" but "I haven't been there time and time again" and "I am not sure how many signs there are." Particularly in light of the other evidence regarding signs, we think Moye's testimony in this regard is too equivocal to be meaningful.

**19.** At Tio's trial, de la Zerda testified that Blue Beach was "closed to the public" only about one month out of the year; the rest of the time it was used for "recreational purposes." (Some evidence of the beach's recreational use was introduced in all four trials.) At Parrilla's trial, Moye testified that there were days when Blue Beach was "off limits" and days when it was not; when not off limits it could be used for "picnics." It is not entirely clear, however, whether the Navy generally acquiesced in the recreational use of the beach by visitors not holding a pass.

**20.** The notice reads:
"WARNING FOR FISHERMEN AND OTHER INTERESTED PERSONS USING THE WATERS SURROUNDING VIEQUES.
THIS IS TO INFORM FISHERMEN CONCERNING NAVAL ACTIVITIES WITHIN THE WATERS AROUND VIEQUES WHICH CAN BE DANGEROUS TO PERSONNEL AND FISHING EQUIPMENT.
THE ENCLOSED MAP IS USED TO INDICATE OPERATIONAL AREAS. DANGERS TO PERSONNEL AND EQUIPMENT ACCOMPANY THE ACTIVITY IN OPERATION AREAS INDICATED."
The notice then lists the itinerary of operations for the week of May 14–20, 1979. The reverse side of the notice contains a rough map of Vieques, with the surrounding waters marked off into different zones. Next to the map is the following text:
"FOR SAFTEY [sic] OF PERSONNEL AND EQUIPMENT, DO NOT ENTER ANY AREA LISTED ON THE ATTACHED WEEKLY SCHEDULE UNLESS YOU HAVE FIRST CONTACTED CERRO MATIAS AND HAVE BEEN ADVISED THAT IT IS SAFE AND HAVE AUTHORIZATION TO PROCEED."

**21.** Likewise, 33 C.F.R. § 207.815, cited by the district court in its findings, restricts *vessels* from entering *waters* off Blue Beach, out to a distance of 1,500 yards. Appellants were not charged with entering these waters, and the informations make no reference to this regulation. Assuming it is a reasonable inference that appellants violated the regulation at some time prior to the time they engaged in the conduct that is the basis of these prosecutions, this fact has only minimal relevance as proof of the violations with which appellants were actually charged.

from the entrance to Port Mosquito east to Conejo Point,

(2) unlawfully entering, or remaining therein, the navigable waters of the danger zone established and published in 33 Code of Federal Regulations 204.234, specifically being in the waters of the Caribbean Sea and Vieques Sound in the vicinity of the Eastern Vieques bombing and gunnery target area,

(3) unlawfully entering all federal lands located in the Island of Vieques, Puerto Rico."

Were Berkan charged with violating 33 C.F.R. §§ 207.815 or 204.234, or in any other manner with unlawful conduct on the waters off Vieques, the first two prongs of this injunction would be relevant; we have already noted, however, that this was not the case. As for the last prong of the injunction, its relevance is also severely limited in this context. This was not a criminal contempt prosecution, nor does the government contend that, in the absence of a law or regulation prohibiting entry generally, going upon a military reservation in contravention of a *court order* directed to a restricted group of people is the same as going upon such a reservation for a "purpose prohibited by law or lawful regulation," in violation of section 1382.[22] Nor does Berkan's constructive notice of the injunction suffice to show her knowledge of the contents of Naval Instruction 5510.9H, which she was charged with violating.

The district court also viewed the fact that Parrilla and Trevathan "voluntarily walk[ed] upon the landing barge without any interference from security personnel"

as "establish[ing]" their "full knowledge" that they were present at Blue Beach illegally. This inference was, in our view, unwarranted. Such action could just as likely have been a gesture of solidarity with those who were arrested, or an attempt to avoid violence, as anything else. Indeed, it would be somewhat far-fetched to construe the voluntary boarding of the landing craft as an "admission of guilt."

Finally, the district court stressed that "widespread media coverage" had "focused the public's attention" on the Navy's "military installations" on Vieques and on prior disruptions of amphibious exercises. The court found it "noteworthy" that appellants' presence on Blue Beach coincided with the Navy's conducting of amphibious operations. If the record had in fact established appellants' knowledge that amphibious landings were to take place on Blue Beach on May 19, 1979, we might well agree that this demonstrated notice that the area was closed to the public on that day. The scheduled occurrence of dangerous military operations would suggest to most people that those in charge had closed off the area. There is little in the records of these cases, however, to show that appellants had foreknowledge of the impending military activities. While scattered bits of testimony in the records of some of the trials indicate that the navy did, in fact, conduct operations on Blue Beach on May 19, 1979, the records also suggest that such activities were not taking place on the beach, or in the nearby vicinity, during the period of appellants' presence there.[23]

---

**22.** It is worth noting that the predecessor to section 1382, Pub.L.No. 350, 60th Cong., 2d Sess. § 45, 35 Stat. 1097 (1909), from which the current version was taken with only minor changes, prohibited entries "for any purpose prohibited by law or military regulation made in pursuance of law . . . ." Under this formulation, it would have been even clearer that entry in violation of a court order was not included. There is no indication that in incorporating the current version as section 1382 of the new criminal code in 1948, Congress intended to substantially broaden the section to encompass entries made in contravention of federal court injunctions. *Cf. United States v. Patz, supra,*

584 F.2d 927 (section 1382 not applicable to entries in violation of state trespass statute).

**23.** At Tio's trial, a newspaper photographer called by Tio stated, on cross-examination, that "on [the] way from La Esperanza to Blue Beach" by boat he observed "some big boats from the United States Navy." These "big boats" were also "sending out the small boats that they have" and the small boats were "going to the beach." The witness did "not know" which beach they were going to, although he later said that "when [he] got to the beach, *they* were on the beach." This testimony was not developed further. Of course, even were we to construe this oblique reference as evi-

Lieutenant Meiss's description of the arrests indicates at least that there were no Navy craft attempting to land on the beach and unload personnel and equipment during the hour that the detentions took place. The notice to fishermen, discussed *supra*, did label one of the "danger zones" in the ocean off the south coast of Vieques as "Amphibious Op Area South." [24] There is nothing in the notice, however, elaborating on this designation, explaining what kinds of activities take place in the "Amphibious Op Area," or notifying exactly where on what appears to be a several mile stretch of beach this activity would proceed. Equally troublesome, there is nothing except the fact that this notice was distributed to several locations on Vieques to show that appellants actually saw the notice or were likely to have done so.

We are nevertheless left with the fact that appellants were part of a large group of people who managed to show up at Blue Beach on a date when amphibious maneuvers were scheduled to take place there. The district court, apparently evaluating this fact in light of its independent knowledge that the "media" had "frequently addressed" the subject of amphibious landings on Vieques (and perhaps its own familiarity with appellants' purposes and mode of operation), concluded that "common sense and experience tells this Court that [appellants] must have known and been aware that Blue Beach was situated within this Naval installation." [25] While this conclusion may well be correct, there are obvious limits to the extent which "common sense and experience"—insofar as this consists of knowledge beyond the scope of the record in a particular case—can substitute for proof at a criminal trial. Indeed, whatever the propriety of taking judicial notice of newspaper articles and the like for purposes of demonstrating a critical element of the government's case, this was not actually attempted here. The parties never moved that the court notice particular newspaper articles,

---

dence that the amphibious landings were already starting, it would suffice only as proof against Tio.

At the beginning of Meiss's testimony at Trevathan's trial, before he began describing the events on the beach, Meiss said that he had been put on "a stand-by" the morning of May 19, and "directed to report to the air terminal . . . in anticipation or prevention of any disturbance that might occur on the island to preclude or hinder any military exercises or military maneuvers." He went on to say:

"During that time, there were some amphibious landings exercises that were taking place.

"There was a ship to shore and the amphibious and anchorage and maneuver areas. There were marine troops on the beach conducting various training exercises in the area of Vieques, the vicinity of Blue Beach and further inland some of the weapons impact ranges, also marine amphibious helicopters conducting training and flights back to shore, ship to shore."

Meiss also testified at Berkan's trial that Blue Beach is used for amphibious exercises, and when asked whether there "were any such activities taking place on May 19, 1979" he answered "yes there were." It is nevertheless quite difficult to imagine such landings taking place during the period Meiss was detaining civilians. Meiss described the detention process as involving virtually the entire beach, and, at each trial, described the detentions in some detail without ever mentioning that landing marines and tanks were getting in the way of security personnel or vice versa. At Tio's trial, several photographs were introduced showing the civilians and security personnel during the time arrests were being made, none of which revealed any landing craft or other evidence of maneuvers under way.

In three cases the court found that the defendants were present on Blue Beach "to interfere" with the planned amphibious landings. No evidence was presented, however, of actual interference, nor was there evidence showing the defendants' intentions when they entered the beach area. While the judge doubtless had local knowledge bearing on these matters, the convictions can stand only to the extent supported by evidence in the records themselves. *See infra.*

**24.** While we have already discussed the fact that this notice is directed toward conduct in the waters off Vieques, use of the word "amphibious" would give some notice that some activities were also to occur on land.

**25.** Knowledge that Blue Beach was within a "naval installation" is not the question we address here. However, viewing the district court's findings as a whole, it seems that the court meant also to imply by this statement that appellants knew the "installation" was restricted and that authorization was required to enter it.

nor did the court inform the parties that it intended to take such notice on its own motion. *Cf.* Fed.R.Evid. 201(e). Furthermore, the district court's findings refer to nothing more specific than "widespread media coverage" of the Navy's previous operations on Vieques; we are hard pressed to see how this can serve to establish these particular defendants' knowledge and notice of Navy restrictions on the use of Blue Beach.[26]

Thus even giving the government the benefit of every possible inference, it is doubtful whether the record supports a finding that appellants reasonably knew that their presence was forbidden—whether on the theory that they knew that dangerous exercises were imminent, or on some other theory.

Still, if the issue of notice or knowledge were the sole weak spot in the government's proof, a reviewing court might be sorely tempted to stretch a point, and—deferring to the trial court's first-hand familiarity—presume a "common sense" basis for finding that appellants had meant their entry to coincide with military exercises, and thus occur when reasonable people would know the reservation was closed. As we discuss in the next section, however, an even more serious deficiency exists, requir-

ing us to reverse the convictions regardless of whether we were to adopt such a relaxed approach to the issue of notice or knowledge.

## IV.

■ Perhaps the most obvious and basic element of a section 1382 prosecution is a demonstration that the defendant entered a "military reservation," "within the jurisdiction of the United States." Appellants contend that the government failed to make such a demonstration here, and surprising as it may appear, they seem to be right.

The evidence and testimony put forth by the government in the various cases proceeded on the theory that the southern border of Camp Garcia runs along the "ordinary high tide line" of the Caribbean Sea. The government's presentation indicated acceptance of the proposition that appellants' penetration of the "ordinary high tide line" was something the prosecution had to prove, and would prove, as a necessary element of its case. The government attempted to demonstrate that appellants had crossed this line through evidence placing appellants, at some point prior to their arrests, either "on dry sand" or landward of the "brim line" or "brim crest."[27] In spite

---

**26.** It is instructive to compare the circumstances in this case with those in *United States v. Floyd, supra*, 477 F.2d 217, relied on extensively by the district court and the government as an example of an analogous section 1382 prosecution. In *Floyd*, the requisite "purpose" to unlawfully enter the military base was inferred from the following:

1) A sign, clearly visible to defendants, informed that permission was required to enter the base.

2) The base was fenced off around the point of entry.

3) The border of the base was marked off by a white line.

4) Guards were stationed at the entrance to the base when the demonstrators arrived.

5) An officer attempted to hold back the demonstrators and informed them they would be arrested if they crossed the white line.

6) After the demonstrators had already crossed the line, another officer read them a statement that they were prohibited from entering the base and would be arrested and

prosecuted pursuant to section 1382 if they did not leave.

7) When asked to leave, the demonstrators sat down in the middle of the road and refused to move.

Precedent such as *Floyd* would have provided ready guidance both for those responsible for dealing with the demonstrators on Blue Beach and those who later prosecuted them. This is not to say that different measures might not have been in order; but if a mass demonstration is expected, it only makes sense to determine in advance what laws and regulations will be invoked, and what public warnings will be needed to be shown in order to obtain and sustain convictions.

**27.** Appellants maintain that the correct term is "berm line," and the government has also adopted this term on appeal.

Even as regards their position on the beach with respect to the berm line, certain appellants argue that the government's proof was deficient. For example, at Parrilla's trial Meiss testified that "the people [on the beach] were

of appellants' contention that neither the berm line nor any other visible line of erosion is equivalent to the "ordinary high tide line" (said to be substantially inland of the visible markings),[28] the district court ruled that Camp Garcia's southern border "extends to the ordinary high tide line *or brim line* of the Caribbean Sea," (emphasis added) and found that appellants had all been present on Blue Beach above the "brim line."

On appeal, appellants renew their contention that the berm line is insufficient as a representation of Camp Garcia's southern border. In response, the government has substantially changed its tack. In oral argument before this court, counsel for the government conceded that "if, in fact, the ordinary high tide line is the boundary of the base, then the government failed to prove [appellants] crossed it." Nor does the government *now* argue that the berm line is the correct border, and that the appellants were shown to have passed this line. Instead, the government now maintains that Camp Garcia encompasses Blue Beach in its entirety, so that it is immaterial where on the beach appellants were shown to have been located. The government argues that the United States acquired title to the Vieques shores and surrounding waters from the Spanish Monarchy in 1899; contends that while Congress has placed the "harbor areas and navigable streams and bodies of water and submerged lands underlying the same in and around the island of Puerto Rico" under "the control" of the Commonwealth, 48 U.S.C. § 749, the United States retains "actual ownership" of the submerged land; and concludes that it would be "absurd" to maintain that the boundaries of a naval base do not extend to the water, particularly when the United States condemned the adjacent land expressly to establish "fleet operating facilities."

The government's recent position may well, for all we know, be correct. The difficulty is, it was never presented in or to the district court, and therefore comes to this appellate tribunal without benefit of findings or rulings below, and without defendants' having had the chance to confront it at trial. Moreover, the validity of the government's present theory is not self-evident. Had the government unveiled it at trial, appellants would have had respectable grounds to try to contest it. Appellants say they would have maintained that the surface of the beach below the high tide mark is, in fact, "owned" by the Commonwealth of Puerto Rico, and thus cannot be implied to have become part of the naval reservation.[29] Arguably, the United States "ced-

---

essentially all on the dry high portion . . . above the brim line." Meiss later identified Parrilla as being present on the beach, but made no specific reference to his position with respect to the berm line. It was stipulated that another witness would testify that Parrilla had been "on dry sand." Meiss also testified that he sighted Berkan "above the brim line on dry sand," but his other testimony makes it somewhat unclear whether this was before or after her arrest.

**28.** Tio's expert, Miranda Corrada, testified this could be as much as ten feet, *see* note 11, *supra.*

**29.** Berkan attempted to argue before the district court that "the beaches in Puerto Rico are of the public domain, and they are public property, and as such the United States government could not have obtained property or title over the beach on which [appellants were] apprehended." The court cut short the argument, saying that since Berkan was apprehended "above the high water mark" the argument was immaterial. Tio also maintained, in sup-

port of his motion for acquittal, that he "was allegedly seen in an area of Blue Beach that . . . is part of the public beaches belonging to the people of Puerto Rico." The court indicated it would accept, at least for purposes of argument, the proposition that Puerto Rico owned the shoreland, and proceeded to probe the "important" issue of whether Tio was above the high tide line. The government made no attempt to argue that the United States, and not Puerto Rico, owned the land below the high water mark, and, indeed, seemed entirely supportive of the district court's approach to the issue. At Parrilla's trial, in response to a lengthy argument by the defense concerning ownership of the beach, the government said only that "assuming for purposes of the argument that the United States only acquired those rights in a condemnation proceeding that was owned by the prior owners," Puerto Rico's ownership of the beach "covers only the area of the beach that extends from the high tide line to the low tide line." (Trevathan presented

ed" to the Commonwealth, in 1917, whatever interests in such land it acquired from the Spanish Crown. *See* 48 U.S.C. §§ 746, 747 & 749; *Commonwealth of Puerto Rico v. SS Zoe Colocotroni*, 456 F.Supp. 1327, 1336 (D.P.R.1978) ("The United States has transferred to the Commonwealth all interest it had in the navigable waters of Puerto Rico and their resources, and in the submerged lands and their resources . . . . The Commonwealth has title to all beaches and to the maritime terrestrial zone abutting the navigable waters . . . ."), *aff'd in relevant part*, 628 F.2d 652, 670 (1st Cir. 1980). *See also Rubert Armstrong v. Commonwealth*, 97 P.R.R. 573, 596–616 (1969).

The government does not seem to deny that in 1917 the United States may have transferred away at least some of its rights in the Vieques beaches. It argues instead that the 1942 condemnation of private property to establish fleet operating facilities, and the statutes authorizing and appropriating money to carry out this condemnation, were "intended to destroy whatever rights previously belonged to the people of Puerto Rico with regard to the shoreland surrounding the property taken from the Eastern Sugar Associates."[30] *But cf.* 48 U.S.C. § 748 ("*President* . . . may from time to time accept *by legislative grant from Puerto Rico* any lands, buildings, or other interests or property which may be received for public purposes by the United States") (emphasis added). Alternatively, the government asks us to find that the United States has acquired ownership of Blue Beach through "adverse possession," a finding it must surely realize would require a factual predicate not to be found in the records before us.[31]

▮ We hold that, regardless of Camp Garcia's "true" border, the government is bound for purposes of these prosecutions by the border line it established at trial—a line it now concedes appellants were not shown to have passed. We reach this conclusion for two reasons. First, to uphold appellants' convictions upon a theory never presented to the district court would raise serious questions of due process. *Dunn v. United States*, 442 U.S. 100, 106–07, 99 S.Ct. 2190, 2194, 60 L.Ed.2d 743 (1979) ("To uphold a conviction on a charge that was neither alleged in an indictment nor presented to a jury at trial offends the most basic notions of due process . . . . [A]ppellate courts are not free to revise the basis on which a defendant is convicted simply because the same result would likely obtain on retrial."); *Cole v. Arkansas*, 333 U.S. 196, 201, 68 S.Ct. 514, 517, 92 L.Ed. 644 (1948) ("No principle is more clearly established than that notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge, if desired, are among the constitutional rights of every accused in all courts . . . ."); *id.*, at 202, 68 S.Ct. at 517 ("To conform to due process of law, petitioners were entitled to have the validity of their convictions appraised on consideration of the case as it was tried and as the issues were determined in the trial court."). *See also Presnell v. Georgia*, 439 U.S. 14, 99 S.Ct. 235, 58 L.Ed.2d 207 (1978); *Gregory v. Chicago*, 394 U.S. 111, 122–24, 89 S.Ct. 946, 952–53, 22 L.Ed.2d 134 (1969) (Black, J., concurring); *Spevack v. Klein*, 385 U.S. 511, 518, 87 S.Ct.

an abbreviated argument that he had not been placed on land under "the exclusive control and ownership of the U.S. Navy.")

**30.** The government also relies on the certification from the Registry of Property, which refers to the southern border of the Navy's property on Vieques as "the Caribbean Sea." The government ignores the fact that in the "Declaration of Taking," from which the United States' claim to this land derives, and which likely provided the basis for the description in the Registry document, the terms "ordinary high tide line of the Caribbean Sea" and "Caribbean Sea" are used interchangeably to describe this border. There is at least a significant possibility that "Caribbean Sea" was used in the Registry certification simply as shorthand for the "ordinary high tide line." *See also Rubert Armstrong v. Commonwealth*, 97 P.R.R. 573, 602–06 (1969).

**31.** In its brief, the government seems to suggest that we supply the missing factual record from the district court findings in a separate civil action, *Romero Barcelo v. Brown*, 478 F.Supp. 646 (D.P.R.1979), *aff'd in part*, No. 79–1626 (1st Cir. Jan. 26, 1981).

625, 629, 17 L.Ed.2d 574 (1967). *Cf. Goodloe v. Parratt*, 605 F.2d 1041 (8th Cir. 1979) (prosecution's change of theory *during* trial violated defendant's due process rights, by creating variance between the information and the theory on which case was tried).

Furthermore, appellate courts will not ordinarily consider theories presented for the first time on appeal. *Johnston v. Holiday Inns, Inc.*, 595 F.2d 890, 894 (1st Cir. 1979); *Martinez Moll v. Levitt & Sons of Puerto Rico, Inc.*, 583 F.2d 565, 571 (1st Cir. 1978); *Dobb v. Baker*, 505 F.2d 1041, 1044 (1st Cir. 1974); *Roto-Lith, Ltd. v. F. P. Bartlett & Co.*, 297 F.2d 497, 500 (1st Cir. 1962); *Bird v. United States*, 241 F.2d 516, 520–21 (1st Cir. 1957). While this principle has most often been applied in civil cases, it has also been invoked in criminal cases to bar the government from seeking to uphold a conviction on a newly presented ground. *United States v. Patrin*, 575 F.2d 708, 712–13 (9th Cir. 1978); *Sizemore v. United States*, 393 F.2d 656 (8th Cir. 1968). We think "the fundamental precept that issues on appeal are to be confined to those duly presented to the trial court," *Jordan v. United States Department of Justice*, 591 F.2d 753, 779 & n.14 (D.C.Cir.1978), has force in a criminal proceeding such as this where the evidence is concededly insufficient to support the convictions below on the theory on which they were obtained.[32]

The government contends that "[t]he boundary of the Naval Station is a legal question that this Court may properly determine for itself, on the basis of the Treaty of Paris, the statutes cited in our brief . . ., and the historical facts established in the *Barcelo v. Brown* opinion," *see* note 31, *supra*. Plainly, however, the resolution of this "legal question" is not "obvious," *cf.*

*Martinez Moll, supra,* 583 F.2d at 571. While the government's new contentions are far from "frivolous," "neither [are they] self-evident." *Dobb v. Baker, supra,* 505 F.2d at 1044. Especially considering the potential importance that resolution of these issues may have for the Commonwealth, we are disinclined to embrace the government's eleventh hour position on the basis of the undeveloped records here.

We, of course, express no opinion on the boundaries of the naval reservation on Vieques or, in general, on the question of the "ownership" of Puerto Rico's shorelands. We hold only that the government failed to prove its case on the theories it advanced before the district court, and that it is now too late to save these prosecutions through advancement of a different "theory of the case."[33]

As the convictions must be reversed for the reasons described, it is not necessary to address the other issues raised by appellants and amici curiae.

*The convictions are hereby reversed.*

---

**32.** While the government characterizes the determination of Camp Garcia's border as a "question of law," *see infra,* it is certainly not part of the "law of the offense," upon which we would normally be expected to rule in a criminal appeal, regardless of the government's position below. It is at most a collateral question of law to be decided prior to a determination of what is, at root, a factual issue.

**33.** We think the government's confusion in these cases regarding Camp Garcia's southern border may also have relevance to the questions of knowledge and notice, discussed *supra.* The government, in essence, asks us to find that appellants "knew" they were trespassing on Camp Garcia simply by being present *below* the high tide line, whereas apparently neither the government's trial lawyers nor the various Navy representatives who testified themselves had "knowledge" of this fact.