**UNITED STATES of America, Appellee,**

v.

**Jacqueline ALLEN, Arthur Laffin, James Patrick Reale, Elmer H. Maas, Defendants–Appellants.**

**Nos. 208, 420, 419 and 421, Dockets 90–1180, 90–1184, 90–1199 and 90–1200.**

United States Court of Appeals, Second Circuit.

Argued Jan. 11, 1991.

Decided Jan. 17, 1991.

**30**

Sarah A. Chambers, Asst. Public Defender, New Haven, Conn. (Thomas G. Dennis, Federal Public Defender, New Haven, Conn., of counsel), for defendant-appellant Jacqueline Allen.

Arthur Laffin, pro se.

James Patrick Reale, pro se.

Elmer H. Maas, pro se.

Leonard C. Boyle, Asst. U.S. Atty., Hartford, Conn. (Stanley A. Twardy, Jr., U.S. Atty., D. Conn., Amy B. Lederer, Asst. U.S. Atty., New Haven, Conn., of counsel), for appellee.

Before WINTER and ALTIMARI, Circuit Judges, and WEXLER, District Judge.*

PER CURIAM:

In the early morning hours of September 4, 1989, appellants Jacqueline Allen, Arthur Laffin, James Patrick Reale, and Elmer H. Maas, along with three other individuals, began a protest against nuclear arms by journeying northward up the Thames River near New London, Connecticut toward the Naval Underwater Systems Center ("NUSC"), a testing laboratory for the submarine force of the United States Navy. With Allen swimming and Laffin, Reale, and Maas traveling in a canoe, the group converged on pier no. 7 at the NUSC, to the north side of which was moored the *U.S.S. Pennsylvania*, a Trident nuclear submarine. Ignoring the warnings of posted guards, Allen swam underneath the pier to the side of the *Pennsylvania* and struck its hull with a hammer. Meanwhile, the trio in the canoe paddled to the stern of the submarine, climbed onto the vessel, and also hammered against its hull. NUSC security personnel promptly arrested the protesters.

Appellants were charged in a three-count information. Count One, brought under 18 U.S.C. § 371, charged conspiracy to violate a federal statute, 18 U.S.C. § 1382, by entering upon a naval reservation for an unlawful purpose. Count Two charged that appellants violated 18 U.S.C. § 1382 by actually entering upon a naval reservation for an unlawful purpose. Count Three charged only Allen with depredation of government property, in violation of 18 U.S.C. § 1361.

A jury convicted Allen on all three counts; Laffin, Reale, and Maas were convicted only of conspiracy to violate Section 1382. Appellants each received a sentence of sixty days' incarceration. They declined appeal bonds and have completed their incarceration.

Appellants' only claim on appeal is that they never intended to, and in fact did not, penetrate the boundary of the naval reservation, i.e., the NUSC, but rather only the "security zone" of the waters surrounding that reservation. We agree with the district court that entering the security zone is entering the naval reservation and is a violation of Section 1382.

* The Hon. Leonard D. Wexler, United States District Judge for the Eastern District of New York, sitting by designation.

Title 18 U.S.C. § 1382 (1988) prohibits "go[ing] upon any military, naval, or Coast Guard reservation ... for any purpose prohibited by law." As the district court properly instructed, a naval reservation includes (1) property owned by the United States Navy and (2) property over which the United States Navy exercises dominion and control and from which it may exclude the general public. *See, e.g., United States v. Mowat,* 582 F.2d 1194, 1206 (9th Cir.1978). It is undisputed that the NUSC grounds, including its piers, are actually owned by the Navy and are a naval reservation. *Id.*

It is also undisputed that the area of the Thames River adjacent to the NUSC is not owned by the Navy, but has nevertheless been designated a "security zone" by federal regulation. *See* 33 C.F.R. § 165.140 (1989). As such, the Navy has exclusive rights to occupy this area. The general regulations for security zones provide:

(a) No person or vessel may enter or remain in a security zone without the permission of the Captain of the Port;

(b) Each person and vessel in a security zone shall obey any direction or order of the Captain of the Port;

(c) The Captain of the Port may take possession and control of any vessel in the security zone;

(d) The Captain of the Port may remove any person, vessel, article, or thing from a security zone;

(e) No person may board, or take or place any article or thing on board, any vessel in a security zone without the permission of the Captain of the Port; and

(f) No person may take or place any article or thing upon any waterfront facility in a security zone without the permission of the Captain of the Port.

33 C.F.R. § 165.33 (1989). Thus, the waters surrounding pier No. 7 and the *Pennsylvania* were occupied and controlled by the Navy and were also a naval reservation. *See Mowat* at 1206. ·

Such a conclusion is a matter of simple common sense. The purpose of a security zone is "to safeguard [vessels] from de-struction, loss, or injury from sabotage or other subversive acts," 33 C.F.R. § 165.30, exactly the type of conduct appellants engaged in. Government ownership of the property in question is not a requisite to violating Section 1382. The Sixth Circuit ruled as much in *United States v. McCoy,* 866 F.2d 826, 830–32 (6th Cir.1989), when it held that a driveway leading to the main entrance gate of an Air Force base constituted part of a military reservation for purposes of Section 1382. *United States v. Parrilla Bonilla,* 648 F.2d 1373 (1st Cir. 1981), did not hold otherwise. That case overturned a Section 1382 conviction for failure to prove that defendant entered a military reservation because the government's theory on appeal as to the definition of the applicable boundary varied from its case at trial. The *Parrilla Bonilla* court explicitly did not reject the theory that the boundaries of a reservation may extend beyond what the government owns in fee. *See* 648 F.2d at 1384–86.

Affirmed.