UNITED STATES of America, Plaintiff,

v.

Alberto de JESUS, a/k/a "Tito Kayak," Defendant.

No. Crim. 00–321(HL).

United States District Court, D. Puerto Rico.

Aug. 9, 2000.

Linda Backiel, San Juan, PR, for Alberto De–Jesus, aka, Tito Kayak, defendant.

Jorge E. Vega–Pacheco, U.S. Attorney's Office District of P.R., Hato Rey, PR, for U.S. Attorney.

## OPINION AND ORDER

LAFFITTE, Chief Judge.

Defendant has moved to dismiss counts two and three of the superseding informa-. tion for lack of jurisdiction. Dkt. No. 29. For reasons that follow, Defendant's motion is hereby denied.

1. Section 1382 provides,
    "[w]hoever, within the jurisdiction of the United States, goes upon any military, naval, or Coast Guard reservation, post, fort, arsenal, yard, station, or installation, for any purpose prohibited by law or lawful regulation; or Whoever reenters or is found

## Discussion

### 1. Count Two—Violation of 18 U.S.C. § 1382[1]

Defendant argues for the dismissal of count two of the information against him. Count two charges Defendant with "unlawfully and knowingly" going upon the naval installation known as Camp Garcia in violation of 18 U.S.C. § 1382. Dkt. No. 22. The information refers to Camp Garcia as being "on lands reserved for the exclusive jurisdiction of the United States." *Id.*

According to Defendant, the Government must show that Defendant entered Navy "land" before he was arrested. Defendant supports this argument by asserting that the reach of the Camp Garcia naval installation is limited to dry land and by pointing out that the information refers to "lands." Because Defendant was arrested in the water, the argument goes, he can not be found guilty of count two of the information.

This interpretation of the terms "land" and "naval installation," however, is not consistent with the interpretation given by federal courts. In *United States v. Allen*, 924 F.2d 29 (2nd Cir.1991), the Second Circuit carefully considered a similar argument from defendants charged with violating § 1382 by swimming alongside a docked Trident nuclear submarine. In that case, the defendants argued that they could not have violated § 1382 because "they never intended to, and in fact did not, penetrate the boundary of the naval reservation ... but rather only the 'security zone' of the waters surrounding that reservation...." *Allen*, 924 F.2d at 30. The court flatly decided that "entering the security zone is entering the naval reservation and is a violation of Section 1382." *Id.*

within any such reservation, post, fort, arsenal, yard, station, or installation, after having been removed therefrom or ordered not to reenter by any officer or person in command or charge thereof—Shall be fined under this title or imprisoned not more than six months, or both."

In arriving at that conclusion, the court considered the fact that the area of the Thames River adjoining the naval installation was not owned by the Navy and was instead only a "security zone" under federal regulations. *Allen*, 924 F.2d at 31. The waters' designation as part of a security zone, however, was sufficient to accord the Navy "exclusive rights to occupy [the] area." *Id.* Because the Navy "occupied and controlled" the waters at issue, they were part of the naval reservation. *Id.* (citing *United States v. Mowat*, 582 F.2d 1194, 1206 (9th Cir.1978), *cert. denied*, 439 U.S. 967, 99 S.Ct. 458, 58 L.Ed.2d 426 (1978)). The court went on to make clear that "[g]overnment ownership of the property in question is not a requisite to violating Section 1382." *Id.* (citing *United States v. McCoy*, 866 F.2d 826, 830–32 (6th Cir.1989)). See also *Mowat*, 582 F.2d at 1208 (holding that "[e]ven if the Navy did not possess a fee simple absolute title to the Island of Kahoolawe, the maintenance of the 'naval reservation' there suffices to support the convictions under 18 U.S.C. § 1382.).

In the instant case, Defendant points out that "the coastal seas, underlying land, reefs, beaches and 'maritime terrestrial zone' ... are ... not susceptible of proprietary ownership by any person or entity, but are rather held in trust by the government for the people of Puerto Rico." Dkt. No. 29. As the Second Circuit in *Allen* and the Ninth Circuit in *Mowat* emphasize, however, government ownership of the property in question is not relevant to determining whether a violation of § 1382 has taken place.

Similar to the "security zone" discussed by the court in *Allen*, the waters in question in this case are part of a "danger zone" established by regulations.[2] These regulations allow the Navy to "occupy and control" these waters. Thus, these waters are part of the Camp Garcia naval reservation, and Defendant's alleged presence on these waters can support a finding of a violation of § 1382.

Defendant makes some additional arguments regarding the "danger zone" regulation. First, Defendant asseverates that the regulation was improperly promulgated. With no argumentation or cited legal authority from Defendant to support this assertion, the Court declines to consider it. See *Cruz–Erazo v. Rivera–Montañez*, 212 F.3d 617, 622 n. 3 (1st Cir.2000) (stating that when a litigant has failed to present properly a legal argument, "we think neither [the district nor the circuit]

---

2. 33 C.F.R. § 334.2 provides as follows:

"(a) Danger zone. A defined water area (or areas) used for target practice, bombing, rocket firing or other especially hazardous operations, normally for the armed forces. The danger zones may be closed to the public on a full-time or intermittent basis, as stated in the regulations."

33 C.F.R. § 334.1470 specifies the area in which Defendant was paddling just prior to his arrest:

"Caribbean Sea and Vieques Sound, in vicinity of Eastern Vieques, bombing and gunnery target area.

(a) The danger zone. From Punta Conejo on the south coast of Vieques at latitude 18 <<degrees>> 06'30", longitude 65 <<degrees>> 22'33"; thence to latitude 18 <<degrees>> 03'00", longitude 65 <<degrees>> 21'00"; thence to latitude 18 <<degrees>> 03'00", longitude 65 <<degrees>> 15'30"; thence to latitude 18 <<degrees>> 11'30", longitude 65 <<degrees>> 14'30"; thence to latitude 18 <<degrees>> 12'00", longitude 65 <<degrees>> 20'00"; and thence to Cabellos Colorados on the north coast of Vieques at latitude 18 <<degrees>> 09'49", longitude 65 <<degrees>> 23'27".

(b) Regulations. (1) It will be open to navigation at all times except when firing is being conducted. At such times, no persons or surface vessels, except those patrolling the area, shall enter or remain within the danger area. Prior to conducting each firing or dropping of ordnance the danger area will be patrolled to insure that no watercraft are within the danger area. Any watercraft in the vicinity will be warned that practice firing is about to take place and advised to vacate the area. (2) The regulations will be enforced by the Commander, U.S. Naval Forces Caribbean, U.S. Naval Station, Roosevelt Roads, Puerto Rico, and such agencies and subordinate commands as he/she may designate."

court is obliged to dream up and articulate [litigants'] arguments for them"). Second, Defendant goes on to argue that even if the regulation were properly promulgated, the government failed to comply with the requirement that two weeks' notice be given before the activation of a danger zone. See 33 C.F.R. § 334.3(c).[3] Defendant is mistaken in his reading of the applicable regulations. The requirement of two weeks' notice applies only when the danger zone is sufficiently short-lived and low-level in nature that promulgation of danger zone regulations is not necessary. 33 C.F.R. § 334.3(c). In contrast, danger zone regulations specifically applying to the area in question have been promulgat-

ed. See 33 C.F.R. § 334.1470. Thus, the requirement of two-weeks' notice is not applicable in the instant case. Accordingly, Defendant's motion to dismiss count two of the information is hereby denied.

### 2. Count Three—Violation of 18 U.S.C. § 113(a)(4)[4]

■ Defendant also moves for dismissal of count three of the information. Count three charges Defendant with assaulting by striking Javier Barrera "at a place within the special maritime and territorial jurisdiction of the United States, namely Camp Garcia" in violation of 18 U.S.C. § 113(a)(4) and 18 U.S.C. § 7.[5]

3. Section 334.3 provides,
   (a) General. The general regulatory policies stated in 33 C.F.R. part 320 will be followed as appropriate. In addition, danger zone and restricted area regulations shall provide for public access to the area to the maximum extent practicable.
   (b) Food fishing industry. The authority to prescribe danger zone and restricted area regulations must be exercised so as not to unreasonably interfere with or restrict the food fishing industry. Whenever the proposed establishment of a danger zone or restricted area may affect fishing operations, the District Engineer will consult with the Regional Director, U.S. Fish and Wildlife Service, Department of the Interior and the Regional Director, National Marine Fisheries Service, National Oceanic & Atmospheric Administration (NOAA).
   (c) Temporary, occasional or intermittent use. If the use of the water area is desired for a short period of time, not to exceed thirty days in duration, and that planned operations can be conducted safely without imposing unreasonable restrictions on navigation, and without promulgating restricted area regulations in accordance with the regulations in this section, applicants may be informed that formal regulations are not required. Activities of this type shall not reoccur more often than biennially (every other year), unless danger zone/restricted area rules are promulgated under this Part. Proper notices for mariners requesting that vessels avoid the area will be issued by the Agency requesting such use of the water area, or if appropriate, by the District Engineer, to all known interested persons. Copies will also be sent to appropriate State agencies, the Commandant, U.S. Coast Guard, Washington, DC 20590, and Di-

rector, Defense Mapping Agency, Hydrographic Center, Washington, DC 20390, ATTN: Code NS 12. Notification to all parties and Agencies shall be made at least two weeks prior to the planned event, or earlier, if required for distribution of Local Notice to Mariners by the Coast Guard.

4. Section 113(a)(4) provides,
   "(a) Whoever, within the special maritime and territorial jurisdiction of the United States, is guilty of an assault shall be punished as follows:
   (4) Assault by striking, beating, or wounding, by a fine under this title or imprisonment for not more than six months, or both."

5. Section 7 does not set forth a substantive offense. It merely defines the special territorial and maritime jurisdiction of the United States. The relevant portions provide,
   "The term 'special maritime and territorial jurisdiction of the United States,' as used in this title, includes:
   (1) The high seas, any other waters within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State, and any vessel belonging in whole or in part to the United States or any citizen thereof, or to any corporation created by or under the laws of the United States, or of any State, Territory, District, or possession thereof, when such vessel is within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State.
   (3) Any lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof, or any place purchased or otherwise ac-

Defendant's argument is essentially that the waters just off of the shore at Camp Garcia are not "within the special maritime and territorial jurisdiction of the United States" and are not a part of Camp Garcia. As the Court has already addressed whether these waters are a part of Camp Garcia, the Court shall not address this argument.

The matter of whether these waters are part of the special maritime and territorial jurisdiction of the United States requires some discussion. Defendant argues that the waters in question can not be part of the special maritime and territorial jurisdiction of the United States under 18 U.S.C. § 7, because the plain language of the statute does not include these waters. The relevant language of § 7(3) refers to "[a]ny lands" and "any place purchased ... or acquired by the United States ... for the erection of a fort ... or other needful building." 18 U.S.C. § 7(3).[6]

Before addressing this argument, the Court notes that its determination that the waters at issue are part of Camp Garcia effectively disposes of this issue. Camp Garcia clearly fits the definition in § 7(3) of the special maritime and territorial jurisdiction of the United States. The definition includes "[a]ny lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof, or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building." 18 U.S.C. § 7(3). Indeed, not even Defendant is attempting to argue that Camp Garcia fails to meet this definition.

Even leaving aside the Court's conclusion that the waters in question are a part

of Camp Garcia, case law interpreting § 7(3) settles the matter conclusively. In *United States v. Holmes*, 414 F.Supp. 831 (D.Md.1976), the court addressed the very question of whether § 7(3)'s language supports the inclusion of waters, rather than just dry land. There the court stated,

> [w]hile it is true that subaqueous lands and waters are not in so many words included within the parameters of 18 U.S.C. § 7(3), it is the lesson of history that the reach of the power of federal jurisdiction will extend, unless expressly or by clear implication excluded by the Constitution or an Act of Congress, to include those matters and things reasonably necessary for the enjoyment of the sovereign powers granted the United States or for the fulfillment of the functions and duties entrusted to it. See, e.g., *Greer, Commander v. Spock*, 424 U.S. 828, 96 S.Ct. 1211, at 1216–1218, 47 L.Ed.2d 505, at 512–516 (1976); Fort Leavenworth v. Lowe, 114 U.S. 525, 539, 5 S.Ct. 995, 1002, 29 L.Ed. 264, 269 (1885). Where, as here, the necessities of secrecy and security of a military post reasonably require that waters and subaqueous lands be restricted from access by the general public in order that the national defense function of the military post can be effectively carried out, Congress, in adopting § 7(3), surely intended that the 'special' jurisdiction of the United States would extend to such waters and subaqueous lands to the greatest extent allowed by the Constitution.

*Holmes*, 414 F.Supp. at 836.

As a matter of sensible statutory interpretation, the court's reasoning is unassailable. The language of § 7(3) extends to include the waters at issue in the instant

---

quired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building."

6. Because § 7(3) provides adequate support for count three of the information, the Court shall refrain from addressing the question of whether § 7(1)'s language can support inclusion of the waters at issue.

case. Although these waters may be subject to the authority of the government of Puerto Rico for ordinary maritime matters, § 7(3)'s recognition of the overwhelming importance of the sovereign power of the United Sates in the pursuit of the national defense is paramount in this case. Thus, the Court hereby denies Defendant's motion to dismiss count three of the indictment.

### 3. The Due Process Argument

█ Finally, Defendant argues that even if the relevant statutes and case law fail to support his statutory arguments, the Due Process Clause of the Fifth Amendment to the United States Constitution prevents his prosecution. See U.S. Const. amend. V. According to Defendant, it is impossible for a person to have notice that his behavior is proscribed when he can be prosecuted for crossing a constantly-shifting line. This line is, according to Defendant, the "mean high tide line." The Court need not dither. The applicable law makes clear that the waters immediately adjoining a naval installation are a part of that installation. A prohibition on passing through those waters hardly runs afoul of the principle of due process of law.

WHEREFORE, Defendant's motion, Dkt. No. 29, is hereby denied in its entirety.

**IT IS SO ORDERED.**