**UNITED STATES of America Plaintiff**

v.

**Pedro ZENON, et al. Defendants**

**Nos. CRIM.02–236 ADC SEC, CRIM.02–237 ADC SEC, CRIM.02–238 ADC SEC.**

United States District Court,
D. Puerto Rico.

Oct. 2, 2003.

Jorge E. Vega–Pacheco, Asst. U.S. Atty., U.S. Attorney's Office, Torre Chardón, San Juan, PR, for Plaintiff.

Harry Anduze–Montano, Esq., San Juan, PR, Fermin Luis Arraiza–Navas, Esq., Santa Rita, Rio Piedras, PR, Joseph C. Laws, Federal Public Defender, San Juan, PR, for Defendants.

## OPINION AND ORDER

CASELLAS, District Judge.

Before the Court is Defendants' appeal from their convictions for violating 18 U.S.C. § 1382 by trespassing on a United States Navy Installation (**Docket # 42**). Trial in this case was held before US. Magistrate Judge Aida Delgado Colón, and Defendants bring this appeal before this Court pursuant to Fed.R.Crim.P. 58(g)(2)(B) and 18 U.S.C. 3402. The parties do not contend the Court's jurisdiction to entertain this appeal. Both parties have filed extensive briefs discussing all the issues raised (**Docket # 44 and 47**). Having examined the record, as well as the relevant case law, the convictions will be **AFFIRMED**.

### Standard of Review

Almost all of the arguments expounded by Defendants in support of their appeal raise pure questions of law, so we review the Magistrate's conclusions of law *de novo*. *United States v. Charles*, 213 F.3d 10 (1st Cir.2000). Nonetheless, Defendants also contend the sufficiency of the evidence *via* their challenge of the Magistrate's denial of their motion for judgment of acquittal under Fed.R.Crim.P. 29. We will address this issue last, and apply a different standard of review. Although we also review the Magistrate's denial of the Rule 29 motion itself *de novo*, the defendants have a high burden to meet on an insufficiency of the evidence claim. *United States v. Zenon–Rodriguez*, 289 F.3d 28, 32 (1st Cir.2002). "[W]e affirm the conviction 'unless the evidence, viewed in the light most favorable to the government, could not have persuaded any trier of fact of the defendant's guilt beyond a reasonable doubt.'" *Id. quoting United States v. Hernandez*, 218 F.3d 58, 64 (1st Cir.2000).

### Factual and Procedural Background

For the purposes of Defendants sufficiency of the evidence claims, we describe

the facts in the light most favorable to the verdict. *Id. citing United States v. Van Horn*, 277 F.3d 48, 54 (1st Cir.2002). Defendants were allegedly found to have been illegally entering the waters around the island of Vieques, in the area specifically known as South Salinas Bay on April 9, 2002, in violation of 18 U.S.C. § 1382. The bay was designated a "danger zone" for purposes of a naval training exercise on that date. According to the Government, a "Fisherman's notice" that announced the exercise was posted in advance of its start in nine different locations in both Spanish and English. As the exercise was in progress, two small motorized boats entered the bay. One boat carried two persons and the other three. All the boat passengers appeared to be disguised in some manner. This included wet suits and ski masks. The exercise was halted and naval harbor security approached the trespassers. They were advised to leave the area several times but they allegedly answered with rude remarks and obscenities, and hurled nuts and bolts at the security personnel. The harbor security boat then retreated to a safe distance.

The trespassers remained in the area for over an hour, interfering with Naval operations. They then left the area and headed west. The United States Coast Guard cutter, Vashon, followed the trespassers towards Esperanza Bay. Ultimately, the Coast Guard launched a small inflatable boat near El Cayo de Afuera to pursue the defendants physically into the bay. In the meantime, officers of the Puerto Rican Police were notified of the events, and they reached the inlet prior to the boats' arrival.

The boats allegedly operated by Defendants arrived a few minutes apart. Sergeant José Velardo and Officer José Benítez Rivera, of the Puerto Rico Police, testified at trial that they observed De-fendants, Pedro Zenón and Regalado Miró, along with a third unidentified individual, disembark from the first boat. Pedro Zenón and Regalado Miró are both known to Sergeant Velardo and Officer Benítez Rivera personally. Minutes later, according to the Government's version of the facts, the second boat arrived and Defendant, Cacimar Zenón, also known to Sergeant Velardo personally, disembarked. The boats were then brought out of the water. The boats with the Zenón brothers and their Co-defendant, Regalado Miró, were identified by witnesses during trial as the same boats that entered South Salinas Bay in violation of 18 U.S.C. § 1382.

Trial in this case was held before U.S. Magistrate Judge Aida Delgado Colón on November 13 and 14, 2002. All Defendants were adjudged guilty of criminal trespass in violation of 18 U.S.C. § 1382, a petty offense, on November 14, 2002. Defendant Regalado Miró was sentenced to one of year probation and 45 days of imprisonment. Pedro Zenón and Cacimar Zenón were each sentenced to one of year probation and four months of incarceration. Defendants appeal their convictions and consequent sentences. An appeal bond was granted for all Defendants.

**Applicable Law and Analysis**

Defendants raise a myriad of arguments in support of their appeal. We will discuss each one in turn.

*"Food Fishing Proviso" Issue*

First, Defendants contend that the Court erred in its finding of guilt because the charged entry into a denominated danger zone must be prosecuted under 33 U.S.C. § 3, and not under 18 U.S.C. § 1382. They further contend that the Court also illegally denied them their right to raise a valid defense because, in cases where a criminal charge is brought under 33 C.F.R. § 334.1470, a mandatory eviden-

tiary hearing must be held in which the defendants may establish, as a jurisdictional defense, that the "danger zone" regulation unreasonably interferes with the food fishing industry. Said hearing was denied in this case. The Government, on the other hand, claims that, given the recent precedent set by the First Circuit Court of Appeals, we may swiftly dismiss Defendants' argument. Since this issue raises pure questions of law, we review the Magistrate's conclusions of law *de novo. United States v. Charles*, 213 F.3d 10 (1st Cir.2000).

The Government contends that Defendants' exact same argument was before the Court of Appeals in *Zenon–Rodriguez*, 289 F.3d at 34–35, and was resolved in the Government's favor. In that case, the defendants argued, just like Defendants in the present case, that the indictment against them should have been dismissed because 33 C.F.R. § 334.1470 was improperly promulgated under 33 U.S.C. § 1, and that it should have been promulgated under 33 U.S.C. § 3. *Zenon Rodriguez*, 289 F.3d at 34–35. The main difference between these two statutes is that 33 U.S.C. § 3 contains the so-called "food fishing proviso" which requires that the authority to prescribe danger zone and restricted area regulations be exercised so as not to unreasonably interfere with or restrict the food fishing industry. Defendants argue that the "food fishing proviso" entitled them to a jurisdictional defense which was not granted to them when tried under 33 U.S.C. § 1.

Because they raised this issue before the district court in their motion to dismiss the indictment, the defendants in *Zenon–Rodriguez* further contended that the district court was obligated to hold an evidentiary hearing on whether the regulation unreasonably interfered with the food fishing industry. Defendants in that case, as well

as in the present one, rely on the First Circuit decisions in *United States v. Saade*, 652 F.2d 1126 (1st Cir.1981) (*Saade I* ) and *United States v. Saade*, 800 F.2d 269 (1st Cir.1986) (*Saade II* ). These cases held that the appropriate statutory authority for an almost identical regulation to § 334.1470 was 33 U.S.C. § 3 and not 33 U.S.C. § 1, because § 3 refers more specifically to the promulgation of regulations for the prevention of injuries from target practice. *Saade I,* 652 F.2d at 1130–32. In that occasion, since the court found that the regulation at issue had been promulgated under Section 3, the statute containing the "food fishing proviso," the court remanded the case to the district court to hold an evidentiary hearing to determine whether the regulation unreasonably interfered with the food fishing industry, in violation with said "food fishing proviso." *Id.* at 1133–34. Nonetheless, the Court of Appeals refused to do the same in *Zenon–Rodriguez.*

They explained that the situation in *Zenon–Rodriguez* was not identical to the one in *Saade I and Saade II. Zenon–Rodriguez,* 289 F.3d at 35. "The regulatory context has changed significantly. In 1993, a new provision, explicitly promulgated under 33 U.S.C. § 3, was added to the danger zone and restricted area regulations. *See* Danger Zone and Restricted Area Regulations, 58 Fed.Reg. 37, 606, 37,606 (July 12, 1993)." *Id.* This added provision states:

> The authority to prescribe danger zone and restricted area regulations must be exercised so as not to unreasonably interfere with or restrict the food fishing industry. Whenever the proposed establishment of a danger zone or restricted area may affect fishing operations, the District Engineer will consult with the Regional Director, U.S. Fish and Wildlife Service, Department of the

Interior and the Regional Director, National Marine Fisheries Service, National Oceanic & Atmospheric Administration (NOAA).

33 C.F.R. § 334.3(b) (2001). The above-quoted provision is virtually identical to the "food fishing proviso" discussed above, and which was only contained in 33 U.S.C. § 3. The Court of Appeals then went on to explain that, "[a]lthough the danger zone regulation in this case was promulgated under 33 U.S.C. § 1, both regulations [the one describing the danger zone and prohibitions under which the defendants were being prosecuted (33 C.F.R. § 334.1470), and the new one establishing the 'food fishing proviso'" (33 C.F.R. § 334.3(b))—] are found in part 334 of title 33 of the Code of Federal Regulations, which deals with danger zones and restricted areas. [Therefore,] 33 C.F.R. § 334.3(b) applies to 33 C.F.R. § 334.1470, and so the two must be read together, thus satisfying the concern in 33 U.S.C. § 3 [regarding the food fishing proviso]. *Zenon–Rodriguez*, 289 F.3d at 35. For this reason, the Court of Appeals stated that the holdings in *Saade I and Saade II* were satisfied by the addition of 33 C.F.R. § 334.3(b), and the consequent application of its new "food fishing proviso" to the danger zone regulation established in 33 C.F.R. § 334.1470. "To the extent that the defendants rely on Saade, their reliance is misplaced." *Id.*

■ In other words, the Court of Appeals has held that 33 C.F.R. § 334.1470 would have been validly promulgated under either 33 U.S.C. § 1 or 33 U.S.C. § 3, because the existence of 33 C.F.R. § 334.3(b) ensures that the requirements of the "food fishing proviso" will be applicable to the danger zone established in 33 C.F.R. § 334.1470, regardless of whether it was promulgated under 33 U.S.C. § 3 (which also contains a "food fishing proviso") or 33 U.S.C. § 1 (which does not).

Given the First Circuit's recent decision regarding the very issue raised before the Court by Defendants, we must find that we need not remand the case for an evidentiary hearing on the "food fishing proviso" issue. Therefore, Defendants' first two arguments fail.

### *Designation of the Danger Zone*

Defendants next contend that the Government never established at trial that the danger zone at issue was properly designated as such on or around April 9, 2002, pursuant to the laws and regulations of the Commonwealth of Puerto Rico and the applicable federal environmental regulations. We disagree.

■ The Government provided evidence that the "fisherman's notice" posted the Wednesday prior to the commencement of the exercise on April 9, 2002 named the exercise and its locations. They also showed that this was done in accordance with regulations regarding "danger zones" as defined in 33 C.F.R. § 334.2 and § 334.1470. The notice named the date and locations of the exercise and was posted in nine separate locations in both Spanish and English. The date, April 9, 2002, was specified and South Salinas Bay was designated as a danger zone in compliance with the regulatory authority governing such zones.

Defendants also argue that the Navy could not legally declare a danger zone under the regulations, as prescribed, because they lacked a National Pollutant Discharge Elimination System (NPDES) permit. Defendants' argument, however, lacks merit. An NPDES permit is issued by the Environmental Protection Agency (EPA), upon application, after the issuance of a State Water Quality Certificate (WQC). For purposes of these regulations, Puerto Rico is treated as a State. The EPA granted the Navy an NPDES

permit in 1984. The permit expired in 1989, at which time the Navy timely filed a request to renew it. The EPA waited ten years for the Puerto Rico Environmental Quality Board (EQB) to issue the necessary WQC.

■ While the application was pending, however, the original NPDES permit was administratively continued. Such an administrative continuance is regulated by 40 C.F.R. § 122.6. This regulation, in relevant part, states:

(a) EPA permits. When EPA is the permit-issuing authority, the conditions of an expired permit continue in force under 5 U.S.C. § 55 8(c) until the effective date of a new permit (see § 124.15) if:

(1) The permittee has submitted a timely application under § 122.21 which is a complete (under § 122.21(e)) application for a new permit; and

(2) The Regional Administrator, through no fault of the permittee, does not issue a new permit with an effective date under § 124.15 on or before the expiration date of the previous permit (for example, when issuance is impracticable due to time or resource constraints).

(b) Effect. Permits continued under this section remain fully effective and enforceable.

40 C.F.R. § 122.6. The application submitted by the Navy dated April 27, 1989 to EPA was reviewed and found to be complete. Thus, the permit was legally continued while awaiting action from EQB. EQB notified EPA of its intent to issue a denial of a WQC and did so formally on February 22, 2000. The Navy submitted a modification to its 1989 NPDES permit application in a letter dated February 18, 2000. The modification was in compliance with Presi-

dent Clinton's January 31, 2000 directive. EPA again requested a WQC from the EQB in a letter dated March 2, 2000, noting that the February 18, 2000 letter represented a substantial modification to the original 1989 application. EPA requested the Navy to provide additional information on May 18, 2000 to be simultaneously transmitted to themselves and the EQB by June 18, 2000. While all this application process continued, by operation of 40 C.F.R. § 122.6 as discussed above, the Navy was in possession of a valid NPDES permit at all times relevant to this case, as far as the EPA, the issuing authority, was concerned. The Navy only formally withdrew its permit renewal application for an NPDES permit in a letter dated April 21, 2003. Thus, the Magistrate did not err in finding that the danger zone at issue was properly designated as such on or around April 9, 2002, pursuant to the laws and regulations of the Commonwealth of Puerto Rico and the applicable federal environmental regulations.

*Ownership and Exclusive Control*

Defendants further argue that the Government failed to prove its ownership or exclusive control over the areas where Defendants are claimed to have illegally entered. However, the Code of Federal Regulations designates several locations in Puerto Rico as federal properties. The court properly took judicial notice of these regulations during the trial. In particular, Section 770.36 of the Code states:

For purposes of these regulations, U.S. Naval installations and properties in Puerto Rico include, but are not limited to, the U.S. Naval Station, Roosevelt Roads (including the Vieques Island Eastern Annexes, consisting of Camp Garcia, the Eastern Maneuver Area, and the Inner Range); the Naval Ammunition Facility, Vieques Island; and the

Naval Security Group Activity, Sabana Seca.

32 C.F.R. § 770.36. Furthermore, 33 C.F.R. § 334.1470 addresses the geographical designations used by the Navy in determining the danger zone at issue in this case:

> The danger zone. From Punta Conejo on the south coast of Vieques at latitude 18 06′30″, longitude 65 22′33″; thence to latitude 18 03′00″, longitude 65 21′00″; thence to 18 03′00″, longitude 65 15′30″; thence to latitude 18 11′30″, longitude 65 14′30″; thence to latitude 18 12′00″, longitude 65 20′00″; and thence to Cabellos Colorados on the north coast of Vieques at latitude 18 09′49″, longitude 65 23′27″.

33 C.F.R. § 334.1470(a). Section 334.1470(b) adds:

> Regulations.
>
> (1) It [ (the danger zone) ]will be open to navigation at all times except when firing is being conducted. At such time, no persons or surface vessels, except those patrolling the area, shall enter or remain within the danger area. Prior to conducting each firing or dropping of ordnance the danger area will be patrolled to insure that no watercraft are within the danger area. Any watercraft in the vicinity will be warned that practice firing is about to take place and advised to vacate the area.
>
> (2) The regulations will be enforced by the Commander, U.S. Naval Forces Caribbean, U.S. Naval Station, Roosevelt Roads, Puerto Rico, and such agencies and subordinate Commands as he/she may designate.

33 C.F.R. § 334.1470(b).

■ Now, the First Circuit Court of Appeals ruled in *Zenon–Rodriguez*, 289 F.3d 28 *quoting United States v. Ventura–Melendez*, 275 F.3d 9 (1st Cir.2001) and *United States v. Allen*, 924 F.2d 29 (2d. Cir.1991), that "government ownership of the property in question is not a requisite to violating Section 1382." This Court has adopted the First Circuit's reasoning in *United States v. de Jesus*, 108 F.Supp.2d 68 (D.P.R.2000). Hence, it is well established that Section 1382 requires only that the Government demonstrate either a possessory interest in, or occupation, or control of, the area reserved by the military. *Id.* In fact, in *Ventura–Melendez*, the Court of Appeals specifically held that 18 U.S.C. § 1382 extends to prosecution of those who enter a danger zone in proximity to a military installation. *Ventura–Melendez*, 275 F.3d 9.

This Court stated, in *de Jesus*, that "[s]imilar to the 'security zone' discussed by the court in *Allen*, the waters in question in this case are part of a 'danger zone' established by regulations. These regulations allow the Navy to 'occupy and control' these waters. Thus, these waters are part of the Camp García naval reservation." *de Jesus*, 108 F.Supp.2d 68. Furthermore, 33 C.F.R. § 334.1470 contemplates that bodies of water adjacent to the named land masses are to be included. This inference can be drawn by its reference to "surface vessels."

■ Defendants allege that the Government failed to prove its ownership or exclusive control over the danger zone. The First Circuit has previously determined that ownership by the Government need not be proven. On the other hand, the regulation itself, 33 C.F.R. § 334.1470(a) is a demonstration of the Government's possessory interest in, and control of, Camp García. Furthermore, the Navy demonstrated its control and occupation on April 9, 2002 when it engaged in the exercise. Testimony at trial showed that there were military exercises ongoing in South Salinas Bay on that date, and that the area was

observed and patrolled by the Navy during the exercises to guard against intruders. The launch of vessels to intercept the trespassers is yet another example of naval control and possessory interest. Consequently, Defendants' argument fails.

### Notice to Fishermen

■ Defendants also claim that their convictions should be reversed because the Magistrate erred in admitting as evidence Exhibit 1, a copy of the fishermen's notice posted by the Navy with regards to the exercises being held on April 9, 2002. However, at trial, Senior Chief Ramón De Jesús testified that in his then current assignment as Schedules Officer he was responsible for generating documents that depict the areas used on a weekly basis by the Navy during its operations. He also testified that, for exercises during which a "danger zone" must be enforced, a "fishermen's notice" was routinely generated on the Wednesday preceding such an exercise. Such documents depict the areas to be used on Vieques. The witness also stated that this procedure was in fact followed with regards to the April 9, 2002 exercises. The notice was sent out in both Spanish and English. We find that his testimony alone was enough for the Magistrate to find that the notice requirements included in the regulations and statutes were met. Hence, the allegedly improper admittance of the copy of the notice would have, in any case, constituted only harmless error. Accordingly, we will go no further regarding this issue.

■ In addition, although not identified as an issue of contention in Defendants' statement of issues, their argument also briefly questions the admission of a map of Vieques and its surrounding waters. We understand, however, that the map was properly admitted as a demons-

trative exhibit intended to assist the trier of fact.

### Magistrate's Jurisdiction over the Case—Petty Offenses

In their appeal, Defendants argue that the Magistrate lacked authority to preside over the trial and impose the sentences in these cases. After the November 13, 2000 amendments to Title 18, U.S. Magistrate Judges have the authority to try and sentence petty offenses. However, Defendants argue that in those Class B misdemeanors in which a term of imprisonment can be imposed, the consent of the defendants is still required. Since Defendants in this case did not give their consent to be tried by the Magistrate, and two of them received a jail sentence, they argue that the Magistrate did not have jurisdiction over their cases.

The first argument, with respect to the Magistrate's authority to try the cases, was already brought up by Defendants before the Magistrate (**Docket ## 16 and 21**). These motions were denied by Magistrate Delgado (**Docket # 26**), and Defendants filed an interlocutory appeal to this Court (**Docket # 28**). Said appeal was denied due to this Court's lack of jurisdiction at that time (**Docket# 30**).

Section 3401 of Title 18 of the United States Code provides that "[w]hen specially designated to exercise such jurisdiction by the district court or courts he serves, any United States magistrate shall have jurisdiction to try persons accused of, and sentence persons convicted of, misdemeanors committed within that judicial district." 18 U.S.C. § 3401(a). This grant of jurisdiction, however, is limited by Section 3401(b), which was amended on November 13, 2000, to read, in pertinent part: "[a]ny person charged with a misdemeanor, **other than a petty offense** may elect, however, to be tried before a district judge for the

district in which the offense was committed." 18 U.S.C. § 3401(b) (emphasis added). This grant of jurisdiction is reiterated in 28 U.S.C. § 635(a): "Each United States magistrate serving under this chapter shall have within the territorial jurisdiction prescribed by his appointment... (3) the power to conduct trials under section 3401, title 18, United States Code, in conformity with and subject to the limitations of that section; (4) the power to **enter a sentence for a petty offense;** and (5) the power to enter a sentence for a class A misdemeanor in a case in which the parties have consented." 28 U.S.C. § 635(a) (emphasis added).

 Magistrates, then, have been granted the power by Congress to conduct trials and enter sentences in cases of petty offenses. Petty offenses are defined in 18 U.S.C. § 19:

> As used in this title, the term "petty offense" means a Class B misdemeanor, a Class C misdemeanor, or an infraction, for which the maximum fine is no greater than the amount set forth for such an offense in section 3571(b)(6) or (7) in the case of an individual or section 3571(c)(6) or (7) in the case of an organization.

18 U.S.C. § 19. Section 3571(b)(6) limits the fines that can be imposed to an individual for a Class B or C misdemeanor to $5,000.00. Defendants argue that, by specifying that a Class B misdemeanor must carry a fine less than $5000.00 to be a petty offense, the definition excludes all offenses in which a term of imprisonment is imposed. Defendants contend that since Section 3571(b)(6) does not provide for a term of imprisonment, no such sentence can be imposed for a petty offense. The problem with this argument is that Section 3571(b)(6) is only concerned with fines. The maximum sentence of imprisonment to be imposed for Class B misdemeanors is

established in 18 U.S.C. § 3581(b)(7) as not more than six months.

Six months is exactly the amount of time that courts have found is the cutoff between "petty offenses" and more serious crimes which afford the defendant the right to a jury trial. The Court of Appeals for the Eleventh Circuit recently held that "a crime that carries a maximum incarcerative term of six months or less is presumed petty." *U.S. v. Chavez*, 204 F.3d 1305, 1310 (11th Cir.2000). In *Chavez*, the court concluded that a Class B misdemeanor, which carries a maximum penalty of six months of imprisonment or a $5,000.00 fine or both, was a petty offense. *Id.* at 1311. "Congress has expressly designated Class B misdemeanors as 'petty offense[s].' *See* 18 U.S.C. § 19." *Id.*

As a matter of fact, Defendants' argument has been previously considered by the Seventh Circuit in the context of the right to a jury trial:

> Former 18 U.S.C. § 1(3) contained an express reference to imprisonment, see *supra* note 2, while the newer § 19 does not, and in that change [defendant] purports to find a statutory entitlement, **arguing that by its silence about prison time § 19 must be read to abolish prison sentences for "petty offenses," making any crime for which a prison term might be imposed a "serious" offense** to be tried to a jury if the defendant demands it. But that is nonsense.

*U.S. v. Kozel,* 908 F.2d 205, 206–207 (7th Cir.1990) (emphasis added). The Seventh Circuit went on to explain:

> **The argument that § 19 abolishes prison sentences for "petty offenses" also fails.** Section 19 does no such thing. It expressly refers to Class B and C misdemeanors, and 18 U.S.C.A. § 3581 (Supp.1989) authorizes prison sentences not only for misdemeanors

but even for infractions. The purpose of § 19 is simply to limit prison time for crimes covered by that section to six months, see 18 U.S.C. § 3559(a)(7), **without forbidding it**, and to put a cap of $5,000.00 on the fines that can be imposed. See 18 U.S.C. § 3571(b)(7). *Id.* at 207 (emphasis added).

In the case before us, Defendants were tried and convicted of a Class B misdemeanor for which the maximum sentence was six months of imprisonment and/or a $5,000.00 fine. Therefore, these were petty offenses, which could be tried before a magistrate, and Defendants' argument fails.

Defendant also contends that Fed. R.Crim.P. 58 limits the power of a magistrate to conducting trials and imposing sentences only in cases of Class B misdemeanor motor-vehicle offenses, Class C misdemeanors, and infractions. The problem with this argument is that jurisdiction to conduct trials and impose sentences is conferred on the magistrates through the statutes discussed above, and not through the Federal Rules of Criminal Procedure. Furthermore, the amendments to 18 U.S.C. § 3401 and 28 U.S.C. § 635 were promulgated after Rule 58. This means that the grant of jurisdiction contained in these amendments takes precedence over any limits which Rule 58 might have imposed previously. While "there are relatively few instances in which the federal courts have been called upon to address a conflict between a federal rule of criminal procedure and a more recently enacted federal statute, in every case, the more recent statute has been found to modify the rule of criminal procedure." *United States v. Hinton,* 215 F.3d 1338, 2000 WL 717085, at *1 (10th Cir.2000) (unpublished disposition). *See also Government of the Virgin Islands v. Parrott,* 476 F.2d 1058 (3d Cir.1973). In *Hinton,* the Court held that the more recent 1996 amendments to 18 U.S.C. § 3401 superseded the conflicting provision in Rule 58. Again, Defendants' argument fails. Consequently, we find that Magistrate Delgado had jurisdiction to conduct trial of this case.

*Insufficiency of the Evidence*

Defendants further contend that there was insufficient evidence presented by the Government to establish beyond a reasonable doubt the identity of Defendants as the trespassers aboard the suspect vessels. Nonetheless, the identity of Defendants was attested to by two Government witnesses. Both of these witnesses also stated that they knew Defendants by sight and for a number of years.

Puerto Rico Police officers, Sergeant José Velardo and José Benítez Rivera, testified at trial and each identified all three Defendants. Sergeant Velardo is a twenty-three year veteran police officer. He testified that, on April 9, 2002, he was working as a Supervisor at the front gates of Camp García when he was requested to go to Esperanza Bay by Naval authorities. Shortly after his arrival, a boat containing Pedro Zenón and Regalado Miró cruised up to the moor. The appearance of both the boat and Defendants, according to the Government witness, matched the descriptions given to him by the Navy authorities. Defendants Zenón and Miró were dressed in wetsuits and recognized by the Sergeant on the scene. Minutes later a second boat arrived carrying Cacimar Zenón and two other individuals. One of these was unknown to Sergeant Velardo and the other recognized by sight, but not as a personal acquaintance.

Officer José Benítez Rivera took the stand and testified similarly to Sergeant Velardo. He also knew the Zenón brothers personally. The officers identified Defendants in court as the same individuals they saw in Esperanza Bay on April 9,

2002. Further, both officers identified exhibits numbered four through seven, as the boats in which Defendants arrived. Defendants attempted to impeach the testimony of these officers with a video tape made by the United States Coast Guard. The officers were unable to identify themselves on the tape. However, comments made during the trial by the witnesses and the court indicate that the tape was of poor quality.

 The issue of identity is a question of fact. The credibility of the witnesses is determined by the trier of fact and great deference is to be given to him or her by the reviewing authority. *United States v. Dunning*, 312 F.3d 528 (1st Cir. 2002). The court found the witnesses credible at trial. Under these circumstances, we believe that the Government has met its lenient burden on appeal by establishing that the evidence, viewed in the light most favorable to the Government, could have persuaded some reasonable trier of fact of Defendants' guilt beyond a reasonable doubt. *Hernandez*, 218 F.3d at 64.

*Sentencing*

Finally, Defendants argue that the sentences imposed by the Magistrate must be reconsidered due to the particular circumstances of this case, where the Magistrate allegedly used inflammatory comments made by the Navy Prosecutor, which are not part of the record of the case, as a basis for increasing the sentences. However, we have found no basis in the record to believe that the Magistrate used any facts beyond the record to sentence Defendants. All Defendants were sentenced in accordance with the law and their criminal histories.

 Defendants claim inflammatory remarks were made by the prosecutor off the record. Beyond their bald allegation, there is nothing to corroborate this claim.

These allegations are insufficient for an appellate court to reverse the lower court's findings. Further, Magistrate Delgado clearly outlined her factual and legal reasons for the sentences imposed upon Defendants. She found that Defendant Miró had one previous conviction for a similar offense and that no violence was involved. On the previous charges, Regalado Miró was sentenced to probation and time-served. She further found that his previous conviction and sentence did not deter Defendant from a future criminal act, and so imposed a tougher sentence this time

The court also found that the Zenón brothers had two prior convictions each. Both convictions were of a similar nature to the instant offense, and one involved acts of violence. The Magistrate was within her authority to sentence them to four months and a period of probation. Defendants were legally sentenced and there is nothing in the record to support the allegation that inflammatory remarks influenced the court's decision.

**Conclusion**

For all the reasons discussed above, Defendants' convictions are **AFFIRMED**.

**SO ORDERED.**